## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AMERICAN FOREST RESOURCE COUNCIL**,<br>5100 S.W. Macadam Ave., Suite 350<br>Portland, OR 97239,<br><br>              Plaintiff,<br><br>    v.<br><br><br>**UNITED STATES OF AMERICA;**<br><br>**BUREAU OF LAND MANAGEMENT**;<br>1849 C Street, N.W.<br>Washington, DC 20240,<br><br>**SECRETARY OF THE INTERIOR**, in his official capacity as an officer of the United States of America,<br>U.S. Department of the Interior,<br>1849 C Street, N.W.<br>Washington, DC 20240;<br><br>**PRESIDENT OF THE UNITED STATES,**<br>in his official capacity as an officer of the United States of America,<br>1600 Pennsylvania Avenue, N.W.<br>Washington, DC 20500;<br><br>           Defendants. | CIVIL ACTION NO. _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; VIOLATIONS OF THE OREGON AND CALIFORNIA RAILROAD LANDS ACT OF 1937, 43 U.S.C. §1181a** |

## **COMPLAINT**

Plaintiff American Forest Resource Council ("AFRC"), by and through its undersigned attorneys, brings this Complaint against the United States of America, the Bureau of Land Management ("BLM"), the Secretary of the Interior, and the President of the United States,

1

alleging violations of the Oregon and California Railroad and Coos Bay Wagon Road Grant Lands Act of 1937, 43 U.S.C. §§ 1181a-1181f:

## I. INTRODUCTION

1.      AFRC challenges the unlawful expansion of the Cascade-Siskiyou National Monument in the waning hours of the previous Administration.  Congress reserved these lands for permanent forest production.  The Antiquities Act does not give the President the power to unilaterally override Congress and reserve the lands for uses other than permanent forest production.  The monument expansion is against the wishes of the public and violates the federal government's promise, made 80 years ago, that Oregon's forests will be a public resource for sustained prosperity.

2.      Since before statehood, Oregon's sustainable forests have been one of the cornerstones of the economy of the Pacific Northwest.  The timber industry built the region and is one of the area's most important economic drivers.  This is particularly true in rural areas where forestry is often the only sector that provides high-quality, family wage employment. Timber industry employment is the bedrock that promotes stability and prosperity in these communities.

3.      In 1937, Congress and President Franklin D. Roosevelt took a critical step in protecting the Northwest's forest economy by passing the Oregon and California Railroad and Coos Bay Wagon Road Grant Lands Act of 1937 ("O&C Act"), 43 U.S.C. §§ 1181a-1181f.  The O&C Act reserved approximately 2.6 million acres of federally owned forestlands in Oregon ("O&C Lands") "for permanent forest production," and ensured that the sustainable timber within this reserve would be "sold, cut, and removed in conformity with the princip[le] of sustained yield for the purpose of providing a permanent source of timber supply, protecting

2

watersheds, regulating stream flow, and contributing to the economic stability of local communities and industries, and providing recreational facilities." 43 U.S.C. § 1181a. "Under the O&C Act, O&C lands must be managed for the primary purpose of sustained yield timber production *unless* such lands are unsuitable for timber production." *Headwaters, Inc. v. Bureau of Land Mgmt., Medford Dist.*, 893 F.2d 1012, 1013 (9th Cir. 1989).

4.      The promise of the O&C Act is particularly important to users of Oregon forests because the federal government owns and manages approximately 60 percent of forestlands in the state.  Due to the United States' majority ownership stake, the timber industry in and neighboring Oregon is reliant on the harvesting, replanting, and effective management of federally owned forests.  The availability of timber from O&C lands is a significant component of the region-wide supply.

5.      In the early 1990s, the timber industry's access to federal forestlands across the Northwest was sharply curtailed.  Large swaths of land were placed in reserves with the remaining lands promised for timber production.  But even this modest promise was not kept.  For example, during the 1980s Oregon's annual average timber harvest was over eight billion board feet, with approximately half the harvest being sourced from federally owned lands.  By the 1990s, the harvest had fallen by fifty percent with fewer than four billion board feet being harvested annually.  This dramatic drop was entirely due to federal restrictions on the harvest of the federally owned forests that had been relied upon for generations.  Today, annual harvests continue to hover around four billion board feet, with less than one billion board feet coming from federal lands.  The vast majority of Oregon's forest products are now sourced from well-managed private forestlands where production has remained consistent since the 1980s.  These

private forests cannot, however, provide the volume of raw materials demanded by the market and have made it extremely difficult for non-landholding companies to survive.

6.    The restriction of federal timberlands has had disastrous consequences for the Northwest's economy.   Dozens of sawmills have been forced to curtail operations or close entirely due to a lack of adequate supply.  Logging companies have been left idle and forced out of business due to a lack of work.  Timber communities have lost thousands of family-wage forestry jobs; the type of jobs that paid enough to allow men and women to provide their families with a high quality of life.   With these difficult to replace jobs gone, much of the rural Northwest, particularly rural Oregon, has been forced into an economic recession.  Many proud residents of these timber towns have faced the painful reality of having to move out of their hometowns or risk watching their families plunge into poverty.

7.    Even while federal regulations have shrunk timber harvest in Oregon over the past 25 years, forestry is the economic backbone of a large swath of the state and provides many good jobs.  The industry's ability to persevere has been in part due to the O&C Act's guarantee that the O&C Lands will remain in production.  While the federal government's implementation of the O&C Act has been deficient in many ways, the Act has provided an important source of sustainable timber during a time in which other federal policies have removed millions of acres of forestland from production.   The O&C Act is the federal government's promise that sustainable timber harvesting will continue to be prioritized on some federal lands.  This promise is critical to ensuring that many timber companies, including many members of AFRC, will stay in business and continue to operate in the future.

8.    In addition to economic benefits, properly managing forests as required by the O&C Act also creates many important non-economic benefits.  For example, properly-managed

4824-6169-8115.6

forests are more resistant to both forest fires and diseases that cause tree die-offs.  In 2015 there was an estimated 350 million dead or "zombie" trees standing in Oregon forests, largely a result of a failure to manage these lands properly.  Dead trees and overgrown underbrush provide ideal conditions for wildfires and result in highly-fueled blazes that quickly become uncontrollable. Trees adapted to regular intervals of lower severity fire are killed when these highly-fueled blazes reach the trees' delicate crowns.  It is no surprise that as effective forest management has been scaled back, the Northwest has experienced several of its most destructive wildfire seasons on record.  Wildfires and disease outbreaks that originate on unmanaged federal land also routinely move into otherwise healthy private forests, or lands owned by local governments or tribes, resulting in additional damage to the timber industry.  The most proven method to prevent tree die-offs and catastrophic forest fires is to sustainably manage forests through harvesting, replanting, and active thinning.

9. AFRC members are also leaders in innovation in environmentally-friendly wood products, particularly the development of engineered wood products like cross-laminated timber that are revolutionizing the green-building industry.  These products enable building construction with substantially less energy use than traditional materials such as steel and concrete.  The O&C Lands are keys to this sustainable future.

10. Active management of federal forestlands also provides local Oregon governments with critical revenue.   Timber sales on O&C Lands are particularly important to eighteen Oregon counties that collectively are entitled to 50 to 75 percent of the gross receipts generated from sales of O&C timber.  Without sufficient active forest management, and sufficient O&C revenues, many Oregon communities lack critical mental health, public safety,

and after school services.  Indeed, revenue shortfalls due to lack of timber harvest recently forced Douglas County, Oregon, to close its libraries.

11.    In the final days of his presidency, President Obama unilaterally repurposed approximately 40,000 acres of O&C Lands in violation of the O&C Act.  This action was taken without any meaningful consultation with the local and regional stakeholders, and will have negative impacts on the regional economy and environment.  President Obama repurposed these lands by issuing Presidential Proclamation 9564 expanding the boundaries of the Cascade-Siskiyou National Monument by approximately 48,000 acres of primarily O&C Lands.  *Proclamation 9564 of January 12, 2017: Boundary Enlargement of the Cascade-Siskiyou National Monument*, 82 Fed. Reg. 6145 (Jan. 18, 2017).  These lands have been congressionally reserved "for permanent forest production. . . in conformity with the princip[le] of sustained yield," since 1937 when the O&C Act was passed.  In contravention of that reservation, Proclamation 9564 now requires that all forest production activities be prohibited on those lands by requiring the Department of the Interior, though the Bureau of Land Management ("BLM"), to manage the lands under guidelines that strictly prohibit the commercial harvest of timber.

12.    The legal question before the Court is straightforward: can the President of the United States unilaterally issue a proclamation under the Antiquities Act directing the land in question be used for a particular purpose (a national monument) that directly contravenes, nullifies, and voids a 1937 Act of Congress that requires the same lands be managed for a different purpose (timber production).  Underlying this legal question is the fundamental Constitutional principle of separation of powers that states a President cannot unilaterally override Congress.  For this reason, Presidential Proclamation 9564 is illegal, *ultra vires*, and overreaches the President's authority.  AFRC requests Proclamation 9564 be declared null and void, that the

4824-6169-8115.6

defendants' enforcement of the proclamation be enjoined, and the defendants be ordered to immediately begin managing the O&C Lands impacted by the proclamations in accordance with the O&C Act's sustainable yield mandate.

## II.  JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this case because it involves questions of federal law.  28 U.S.C. § 1331.

14.    Venue is proper in this Court because this is an  action against the United States, its agencies, and its officers, and also because a  substantial part of the events and omissions giving rise to the claims in this case occurred in this  District.  28 U.S.C. § 1391(e).  Specifically, the Proclamation was prepared by officials in the Washington, D.C. Office of the Department of the Interior and was signed and issued by President Obama at the White House.

15.    This Court has authority to grant the declaratory and injunctive relief requested pursuant to 28 U.S.C. §§ 2201-2202.

## III.  PARTIES

16.    Plaintiff American Forest Resource Council ("AFRC") is a forest products trade association and Oregon nonprofit corporation, which represents approximately 90 lumber and plywood manufacturing companies and landowners throughout Oregon, California, Washington, Idaho, and Montana.   AFRC supports sustainable and environmentally responsible management of public lands, and AFRC and its members actively participate in federal agency land management decisions that involve the allocation and use of forest resources in the areas where its members conduct business.  AFRC maintains offices in Olympia, Washington and Portland and Eugene, Oregon, and employs field representatives throughout the five states in which it works.

4824-6169-8115.6

17.    The interests of AFRC members are directly tied to the availability of timber, and for its members which purchase timber in Oregon, particularly tied to the availability of timber from O&C Lands managed by BLM.  AFRC members based in and outside Oregon have harvested and processed timber from O&C Lands, and AFRC members intend to continue to do so in the future.  The business interests of AFRC's members have been and continue to be adversely impacted by the federal government's failure to provide adequate timber harvests from federal forest lands, and for its members with interests in Oregon forests, particularly adversely impacted by the BLM's failure to provide adequate timber harvests from O&C Lands.  AFRC's members have curtailed operations or gone out of business entirely as a consequence of the lack of legally available timber to harvest from federal lands, including the lack of legally available timber to harvest from O&C Lands.  AFRC members have harvested and processed timber from the O&C Lands at issue in this case before those lands were illegally repurposed for the expansion of the Cascade-Siskiyou National Monument, and members intended to continue to harvest and process timber from those lands.  As a result of the expansion of the Cascade-Siskiyou National Monument, AFRC members have been denied the opportunity to harvest and process over forty thousand acres of timber reserved by Congress for timber production.

18.    Defendant United States of America is a sovereign entity that holds title to and manages the lands in question.

19.    Defendant BLM is an agency of the United States government that is situated within the Department of the Interior.  The BLM is charged with managing both O&C Lands and the Cascade-Siskiyou National Monument.

20.    Defendant Secretary of the Interior is the officer of the United States who heads the United States Department of the Interior, which houses the BLM.  The Secretary of the

4824-6169-8115.6

Interior is charged with managing both O&C Lands and the Cascade-Siskiyou National Monument.

21.     Defendant President of the United States is an officer of the United States who acts as both the head of state and head of government.  The Cascade-Siskiyou National Monument expansion at issue in this case was enacted by a proclamation of then-President Barack Obama.

## IV.     BACKGROUND ALLEGATIONS

### A.     The Antiquities Act Of 1906

22.     The Antiquities Act of 1906 authorizes the President to establish by proclamation national  monuments on federal lands that contain "historic landmarks, historic and prehistoric structures,  and other objects of historic or scientific interest."  54 U.S.C. § 320301(a).  In establishing national monuments, the President is limited to protecting "the smallest area compatible with the proper care and management of the objects to be  protected."  *Id.* § 320301(b).

### B.     The O&C Act Of 1937

23.     The O&C Act was the final management decision arising from an 1866 congressional land grant made to facilitate the construction of a railroad between Portland, Oregon, and the California border.  The grant was made not only to build a railroad but also to promote economic development in Western Oregon and Northern California.  The original grant included over three million acres of land that the railroad was permitted to sell under particularized circumstances as compensation for railroad construction.  The railroad's handling of land sales became mired in fraud and corruption, resulting in Congress taking actions to curtail the original grant while still promoting the economic development of Oregon.

4824-6169-8115.6

24.     Decades after the original land grant, and after exposure of the widespread fraud, Congress passed the Chamberlain-Ferris Revestment Act in 1916 which revested all of the unsold grant lands back to the United States.  These revested lands are what today are the O&C lands.   The Chamberlain-Ferris Revestment Act also acknowledged the importance of these lands to Oregon's economic vitality and instructed the Department of the Interior to sell the timber from the O&C Lands as "rapidly as reasonably prices can be secured." Chamberlain-Ferris Revestment Act of 1916, ch. 137, § 4, 39 Stat. 218, 220.

25.     In 1937 Congress passed the O&C Act to ensure that the lands would be managed in perpetuity for timber production.  The O&C Act requires that the revested lands:

> "**<u>shall</u>** be managed. . . for permanent forest production, and the timber thereon **<u>shall</u>** be sold, cut, and removed in conformity with the principal of sustained yield for the purpose of providing a permanent source of timber supply, protecting watersheds, regulating stream flow, and contributing to the economic stability of local communities and industries, and providing recreational facilities."

43 U.S.C. § 1181a (emphasis added).  The act goes on to read:

> "A forest unit will provide, insofar as practicable, a permanent source of raw materials for the support of dependent communities and local industries of the region."

*Id.* Congress was unwaveringly clear that the O&C Lands "shall be managed" as a timber reserve on a permanent basis.  It was also clear that the lands were to be a source of "raw materials" for "local industries."

26.     Since passage of the Act, the O&C Lands have been managed as working timberlands.   Annual production from O&C Lands has fluctuated over the years, reaching as high as approximately 1.6 billion board feet in 1960, before plummeting in the 1990s as a result of management changes.  The promise of the O&C Act has not been fully realized in recent decades due to overly restrictive federal policies, but purchasers of Oregon timber nevertheless continue to be heavily reliant on O&C Lands, particularly that segment of the industry that does

not own large private tracts of land. Without continued and adequate supply of timber from O&C Lands, many AFRC members would face substantial financial harm, including lost revenues, lost profits, and in some cases the loss of a business. In November 2016, AFRC member Rough & Ready Lumber was forced to close permanently after 90 years in business in Cave Junction, Oregon. Rough & Ready was one of the few sources of steady family-wage employment in Cave Junction and Josephine County. Rough & Ready is surrounded by federal timberlands administered by BLM. Rough & Ready's closure was due to BLM's failure to sell timber in the quantities required by the O&C Act.

C.    **The Cascade-Siskiyou National Monument's Repurposing of O&C Land and its 2017 Expansion.**

27.    On June 9, 2000, President Clinton issued Presidential Proclamation 7318 creating the original Cascade-Siskiyou National Monument, purportedly under authority granted to the President by Antiquities Act of 1906. The original monument was created by repurposing 52,000 acres of federal land. Proclamation 7318 states "[t]he  commercial harvest of timber or other vegetative material is prohibited, except when part of an  authorized science-based ecological restoration project aimed at meeting protection and old  growth enhancement objectives." 65 Fed. Reg. 37249, 37250 (June 9, 2000). The proclamation  further states that "[n]o portion of the monument shall be considered to be suited for timber  production, and no part of the monument shall be used in a calculation or provision of a  sustained yield of timber." *Id.* Proclamation 7318 charged the Secretary of the Interior, through the BLM, to prepare a  management plan for the monument. The current management plan for the Monument was  issued in 2008 and prohibits commercial  timber harvest inside the monument.

28.    In October of 2016, the BLM released a plan detailing a proposed expansion to the Cascade-Siskiyou National Monument that included nearly 50,000 acres of O&C lands. The

BLM's release of the proposed expansion was the first the timber industry had heard of the expansion, and industry representatives were largely shutout of any discussions regarding the expansion.  The O&C Lands on which the industry relies were essentially pulled out of production with little or no consultation with the affected parties.

29.    Eight days before leaving office, on January 12, 2017, President Obama issued Proclamation 9564, titled *Boundary Enlargement of the Cascade-Siskiyou National Monument*. The area covered by President Obama's proclamation was only slightly smaller than BLM's October 2016 proposed expansion, and included over 40,000 acres of O&C lands.

30.    Proclamation 9564 states that "[a]ll Federal lands and interests in lands within the boundaries" of the monument "are hereby . . . withdrawn from all forms of entry, location, selection, sale, or other disposition under the public land laws."  82 Fed. Reg. 6145, 6148-49 (Jan. 12, 2017).

31.    Proclamation 9564 also states that the Secretary "shall manage the area being added to the monument through the [BLM] as a unit of the National Landscape Conservation System, under the same laws and regulations that apply to the rest of the monument."  82 Fed. Reg. at 6149.  Because Proclamation 7318 prohibits the commercial harvest of timber in the original Cascade-Siskiyou National Monument area, Proclamation 9564 prohibits commercial harvest of timber in the expanded monument area.

32.    Proclamation 9564 attempts to unilaterally repurpose tens of thousands acres of O&C Land expressly designated by Congress for commercial harvest of timber.  The Proclamation purports to override Congress' mandate that these lands be managed as sustainable forests for the benefit of local industries, and instead mandates that they be managed as untouched wild places.

4824-6169-8115.6

33.     While the Antiquities Act provides the President wide discretion to reserve or withdraw federal lands, it does not allow the President to override Congress' determination that a particular piece of land should be devoted to a particular purpose.

34.     In 1940, then-President Roosevelt faced a nearly identical fact pattern when he considered expanding the Oregon Caves National Monument.  This illegal action was halted after the Solicitor of the Department of the Interior concluded that "the president does not have such authority," because "Congress has set aside the lands for the specified purpose" of timber production.  *See* Department of the Interior Solicitor's Opinion M. 30506 (Mar. 9, 1940).  Thus in 1940, shortly after passage of the O&C Act, the executive branch recognized that it lacked authority to take the actions challenged in this case.

**D.      AFRC Members' Use and Intended Future Use of the O&C Lands Included in the Monument.**

35.     The Monument designation includes O&C Lands managed by both the BLM's Medford and Lakeview District Offices.  AFRC members regularly harvest timber on O&C lands within the Medford and Lakeview Districts.  In September 2016, a member of AFRC successfully bid on the rights to harvest timber on an 85 acre tract of O&C Land called "Jigsaw," which is located in the Klamath Falls Resource Area of the Lakeview District.  The area known as "Jigsaw" was designated as part of the Monument in 2017. By contract the recipient has until 2018 to finish the harvest.  Six different timber companies bid to obtain the rights to Jigsaw, and the winner paid substantially over the minimum bid price.  The number of bidders bidding on Jigsaw, and the high price paid, are evidence of the shortage of timber currently facing the region.

36.     Prior to Monument expansion, the BLM Lakeview District had planned out a number of commercial harvests of O&C Lands that were to occur in what is now the Monument.

4824-6169-8115.6

This included a 2017 sale called "Leek Peak", 2018 sales called "Summit" and "Sweet Vidalia," a 2019 sale called "Fourth Leaf," a 2020 sale called "Stag," 2021 sales called "Mr. Clean" and "Terminus," and a 2022 sale called "LBJ." These sales can no longer legally proceed given the Monument expansion. AFRC members would have bid on these O&C timber sales, and likely would have been awarded contracts to remove timber from areas now within the monument. The BLM estimated these sales would have resulted in the production of approximately 40 million board feet of timber. These sales would support approximately 720 direct and indirect jobs. Without the proceeds of these sales, it is likely that the Lakeview District's Klamath Falls Resource Area will not produce enough timber sale revenue to cover area operating expenses, resulting in a possible shut down of the Klamath Falls office.

37. The BLM's Medford District has also been substantially impacted by the Monument designation. It is currently estimated that 10 percent of timber lands in the Medford District have been pulled from production as a result of the Monument designation. Given the timber industry's reliance on access to federal lands, this lost production has and will have major financial impacts on timber companies operating in the Medford District.

38. AFRC members rely upon O&C Lands timber sales in the Medford and Lakeview BLM districts. Several AFRC members have a long history of bidding on and being awarded federal timber contracts in the area. All of these companies face significant financial harm as a result of the Monument expansion.

39. The Monument has and will continue to directly impact the bottom lines of AFRC's members, threatens their ability to remain in business, poses a significant risk to the timber industry of Southern Oregon, and thereby risks the continued decimation of the economy of Southern Oregon.

## CLAIM FOR RELIEF

**Proclamation 9564 Violates the O&C Act, is *Ultra Vires,* Constitutes an Illegal Overreach of the Powers of the President of the United States, and Exceeds the Powers delegated to the President by the Antiquities Act.**

40.     Plaintiff re-alleges and incorporates paragraphs 1-39.

41.     Congress mandated that O&C Lands be managed for the permanent production of timber.  It requires that O&C Lands be managed for permanent forest production. 43 U.S.C. § 1181a.

42.     The President of the United States has unilaterally violated the O&C Act on tens of thousands of acres of O&C Land by unilaterally issuing Proclamation 9564, which requires that these lands be managed as a national monument without of any commercial timber production.

43.     Under the Property Clause of United States Constitution, Art. IV, § 3, cl. 2, Congress' power over federal lands is paramount.  If Congress sets aside land for a particular purpose, the President does not have the power to override Congress' judgment by issuing a presidential proclamation that repurposes that land, even where the President exercises the powers granted him under the Antiquities Act.  Where, as in this case, a presidential proclamation and act of congress directly conflict on a matter of federal land management, the Constitutional doctrine of separation of powers requires that the president's unilateral action give way to an Act of Congress.

44.     To the extent the Antiquities Act and the O&C Act conflict, the O&C Act was passed at a later date and deals with more specific subject matter, so the O&C Act supersedes and nullifies the Antiquities Act.

15

## PRAYER FOR RELIEF

WHERFORE, Plaintiff prays for judgment as follows:

A.      Declare that Proclamation 9564 violates the O&C Act and the Antiquities Act by mandating that O&C Lands be managed for a purpose other than sustained yield timber production;

B.      Declare Proclamation 9564 is void as it is Presidential action taken *ultra vires*;

C.      Declare that the O&C Act requires the O&C Lands to be managed for permanent forest production, notwithstanding any other provision of law;

B.      Vacate and enjoin Proclamation 9564 and any actions to enforce Proclamation 9564;

C.      Award Plaintiff its reasonable attorneys' fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

D.      Grant Plaintiff such further relief as may be just, proper, and equitable.


DATED:  3/10/17

                              By: */s/Diane M. Meyers*
                                     Diane M. Meyers, USDC DC Bar No. WA0002
                                     David O. Bechtold, USDC DC Bar No. OR0005
                                     MILLER NASH GRAHAM & DUNN LLP
                                     Pier 70
                                     2801 Alaskan Way, Suite 300
                                     Seattle, Washington  98121
                                     Telephone:   206.624.8300
                                     Facsimile:   206.340.9599

                                     Attorneys for Plaintiff
                                     American Forest Resource Council

4824-6169-8115.6