UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN FOREST RESOURCE COUNCIL, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Case No. 16-1599 (RJL) |
| BRIAN STEED, *et al.*, | ) ) ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| ASSOCIATION OF O & C COUNTIES, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Case No. 16-1602 (RJL) |
| BRIAN STEED, *et al.*, | ) ) ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| ASSOCIATION OF O&C COUNTIES, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Case No. 17-280 (RJL) |
| DONALD J. TRUMP, *et al.*, | ) ) ) | |
| Defendants, | ) ) ) | |

| | |
|---|---|
| SODA MOUNTAIN WILDERNESS COUNCIL, *et al.*, | )<br>)<br>) |
| Defendant-Intervenors. | )<br>) |

| | |
|---|---|
| AMERICAN FOREST RESOURCE COUNCIL, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) Civil Case No. 17-441 (RJL) |
| UNITED STATES OF AMERICA, *et al.*, | )<br>)<br>) |
| Defendants, | )<br>)<br>) |
| SODA MOUNTAIN WILDERNESS COUNCIL, *et al.*, | )<br>)<br>) |
| Defendant-Intervenors. | ) |

# MEMORANDUM OPINION

(March 31, 2019)

[Dkt. ## 29, 30, 41 (in Case No. 16-1599); 17, 18 (in Case No. 16-1602); 41, 44, 46 (in Case No. 17-280); 41, 44, 46 (in Case No. 17-441)]

Each of the four above-captioned civil actions involve a challenge to the management by the United States of America (the "Government" or the "United States") of certain land subject to the Oregon and California Railroad and Coos Bay Wagon Road Grant Lands Act of 1937 ("O&C Act"), 43 U.S.C. § 2601 *et seq.*, a statute that regulates

2

timber harvest on certain federal land in western Oregon ("O&C land"). In 2016, the Bureau of Land Management ("BLM") issued two Resource Management Plans ("the 2016 RMPs") that divided O&C land into six categories. The extent to which timber harvest is permitted on O&C land under the 2016 RMPs depends on the category to which a given parcel of land is assigned. On January 12, 2017, President Obama, shortly before he left office, issued a proclamation ("Proclamation 9564") that enlarged the Cascade-Siskiyou National Monument in southern Oregon. *See* Proclamation 9564, 82 Fed. Reg. 6145 (Jan. 18, 2017). Nearly 40,000 acres of the newly added land is O&C land, and commercial timber harvest, as a result of the monument designation, is effectively no longer possible on this land that falls squarely within the monument's boundaries. *See* Proclamation 7318, 65 Fed. Reg. 37,249, 37,250 (June 13, 2000).

Plaintiffs in these cases[1] argue that the 2016 RMPs and Proclamation 9564 conflict

---

[1] In Case Number 16-1599, the American Forest Resource Council (a forest products trade association representing lumber and plywood manufacturing companies) as well as the Carpenters Industrial Council, Douglas Timber Operators, Inc., C & D Lumber Co., Freres Lumber Co. Inc., Seneca Sawmill Company, Starfire Lumber Co., Inc., and Swanson Group Mfg. LLC (all entities engaged in business related to the timber industry) sued Brian Steed, BLM's director, and Ryan Zinke, the Secretary of the Interior, alleging that the 2016 RMPs are arbitrary, capricious, and unlawful. In Case Number 16-1602, the Association of O&C Counties, which represents seventeen counties in western Oregon that contain O&C land, sued the same defendants on the same allegations. In Case Number 17-280, the Association of O&C Counties sued President Donald J. Trump; the United States of America; Ryan Zinke, the Secretary of the Interior; and BLM, alleging that Proclamation 9564 is *ultra vires*. In Case Number 17-441, the American Forest Resource Council sued the same defendants on the same allegations about Proclamation 9564. The Soda Mountain Wilderness Council, the Klamath-Siskiyou Wildlands Center, and Oregon Wild (public interest groups focused on protecting the environment in and around the Cascade-Siskiyou National Monument) intervened in Case Numbers 17-280 and 17-441 to defend Proclamation 9564. Throughout this consolidated Memorandum Opinion, "plaintiffs" will refer to the collective plaintiffs in all four cases. "Defendants," "the Government," or the "United States" will refer to the collective named defendants in all four cases. And "intervenors" or "defendant-intervenors" will refer to the Soda Mountain Wilderness Council, the Klamath-Siskiyou Wildlands Center, and Oregon Wild, collectively.

with existing timber harvest mandates in the O&C Act. They moved for summary judgment, asking that the plans and proclamation be set aside. The Government cross-moved, adopting a different reading of the O&C Act, and seeking summary judgment that the 2016 RMPs and Proclamation 9564 are lawful. Three groups intervened in Case Numbers 17-280 and 17-441 to defend Proclamation 9564, and they filed their own cross-motions for summary judgment, which, like the others, turn on the scope of Congressional directives in the O&C Act.

Upon careful consideration of the parties' briefs, the relevant law, and the entire record, I have determined that the best course at this juncture is to DENY all pending summary judgment motions without prejudice and to REMAND this matter to BLM for an explanation of how, if at all, the administration of O&C land changed after President Obama issued Proclamation 9564 that removed approximately 16,000 acres of land from the "harvest land base" category of the O&C land, which was designated by BLM for continual timber production.[2] The parties can then refile summary judgment motions taking into account the completed administrative and summary judgment records.

---

[2] To be clear, the two Administrative Procedure Act challenges to BLM's agency actions, Case Numbers 16-1599 and 16-1602, are being remanded to the Director of BLM for a "more complete explanation" of its actions. *Checkosky v. SEC*, 23 F.3d 452, 463 (D.C. Cir. 1994). For the reasons set forth in this Memorandum Opinion, BLM shall supplement the summary judgment record in the challenges to Proclamation 9564, Case Numbers 17-280 and 17-441, with the same explanation. *See Bark v. United States Forest Serv.*, No. 12-1505, 2014 WL 12775216, at *4 (D.D.C. Oct. 22, 2014) (ordering federal agency to supplement the record); *Ramsey v. Moniz*, 75 F. Supp. 3d 29, 47 (D.D.C. 2014) (noting that the parties were ordered to supplement the summary judgment record before a summary judgment motion was decided).

## BACKGROUND

### I. The O&C Act

The O&C Act governs BLM's management of approximately two million acres of land in western Oregon that was granted to the Oregon and California Railroad in 1866 but revested to the United States after the railroad violated conditions Congress had placed on the land grant. *See Oregon & C.R. Co. v. United States*, 238 U.S. 393, 399-410 (1915) (recounting the history of the land grant and revestment); *Clackamas Cty. v. McKay*, 219 F.2d 479, 481-83 (D.C. Cir. 1954) (same), *vacated as moot*, 349 U.S. 909 (1955). Beginning in the early 1900s, Congress enacted a series of statutes prescribing how the revested land should be managed. One such statute, the O&C Act, was passed in 1937 and regulates, among other things, timber harvest on O&C land. *See* 43 U.S.C. § 2601.

Of particular relevance here, the Act *requires* that O&C timberland be "managed . . . for permanent forest production" and that O&C timber "be sold, cut, and removed in conformity with the princip[le] of sustained yield." 43 U.S.C. § 2601. To facilitate the harvest and sale, BLM must declare an "annual productive capacity," *id.*, also known as an allowable sales quantity ("ASQ"),[3] for O&C timberland. A commensurate amount of timber must then be sold from O&C land each year. *See id.*

The O&C Act also guarantees that a portion of the proceeds from the timber sales will be paid to the Oregon counties that contain O&C land. *See* 43 U.S.C. § 2605(a).

---

[3] BLM uses "annual productive capacity," "allowable sale quantity," and "annual sustained yield capacity" synonymously. *See* Fed. Defs.' Cross-Mot. Summ. J. (Case No. 16-1599) at 7 & n.3 [Dkt. # 30].

Timber proceeds are deposited into "the 'Oregon and California land-grant fund'" and fifty percent of that fund is distributed annually to "the counties in which the lands [subject to the Act] are situated." *Id.* According to BLM, the O&C Act resulted in over $1.4 billion being paid to Oregon counties in the Act's first fifty years. *See* U.S. Dep't of the Interior, BLM, *O&C Sustained Yield Act: the Land, the Law, the Legacy (1937-1987)* at 14-15, *available at* https://www.blm.gov/or/files/OC_History.pdf.

In 1990, the Act's fifty-third year, the U.S. Fish and Wildlife Service classified the northern spotted owl as a threatened species under the Endangered Species Act of 1973 ("ESA"), 16 U.S.C. § 1531 *et seq*. *See* Determination of Threatened Status for the Northern Spotted Owl, 55 Fed. Reg. 26,114 (June 26, 1990). Two years later, a federal district court in Oregon enjoined timber sales on lands that are suitable habitat for the threatened owls. *See Portland Audubon Soc'y v. Lujan*, 795 F.Supp. 1489, 1510-11 (D. Or. 1992), *aff'd sub nom. Portland Audubon Soc'y v. Babbitt*, 998 F.2d 705 (9th Cir.1993). Companies and Oregon counties that benefit from O&C land timber sales intervened in that lawsuit, but the court nevertheless extended the injunction to land governed by the O&C Act. *See id.* at 1505-07.

Much of the period since the northern spotted owl's classification has been consumed by a veritable tsunami of legal actions over how to manage O&C land. *See Am. Forest Council v. Shea*, 172 F. Supp. 2d 24, 27 (D.D.C. 2001) (Jackson, J.). Parties have challenged land management plans announced by BLM, then settled their claims, only to later allege breaches of the settlement agreement. *See Douglas Timber Operators, Inc. v.*

6

*Salazar*, 774 F. Supp. 2d 245, 247-51, 261 (D.D.C. 2011). And BLM has issued and withdrawn land management plans, only to see courts reinstate the plans, then order them vacated again. *See Pacific Rivers Council v. Shepard*, No. 3:11-442, 2011 WL 7562961, at *1-3, *10 (D. Or. Sept. 29, 2011), *report and recommendation adopted as modified*, 2012 WL 950032 (D. Or. Mar. 20, 2012).

Against this backdrop of highly contentious litigation, the Government took two recent actions that affect management of O&C land.

## II. The 2016 RMPs

In 2016, BLM revised the RMPs that detail how it manages O&C land. The 2016 RMPs divide the land into six categories. *See* Administrative Record (Case No. 16-1599) ("AR") at JA-46, IND_0514399-402 [Dkt. # 37]. Of the six, only one category—"harvest land base"—is managed to "achieve continual timber production that can be sustained through a balance of growth and harvest." *Id.* at JA-46, IND_0514402. Other categories of land include riparian reserves, which are managed to "[m]aintain and restore riparian areas," and late-successional reserves, which are managed to, among other things, promote nesting and roosting habitat for the northern spotted owl and marbled murrelet. *Id.* In these latter categories, timber harvest is permitted for certain limited purposes. *See id.* at JA-2, IND_0513044. But when BLM calculated the ASQ of O&C timberland for the 2016 RMPs, the agency looked only to timber grown in the 498,597-acre "harvest land base," which is approximately twenty percent of the land governed by the 2016 RMPs. *See id.* at JA-1, IND_0512707-10; JA-1, IND_0512745; JA-2, IND_0513027-29; JA-2,

IND_0513065.

Based on the harvest land base, BLM declared an ASQ of 205 million board feet in the 2016 RMPs. *See* AR at JA-1, IND_0512708 (ASQ for Coos Bay, Eugene, and Salem of 130 million board feet); JA-2, IND_0513027 (ASQ for Klamath Falls, Medford, and Roseburg of 75 million board feet). This ASQ is slightly larger than the ASQ set in the 1995 RMPs BLM was revising. *See id.* at JA-1, IND_0512723-24. But it remains far smaller than many ASQs BLM has declared in the past. In the 1960s and 1970s, before O&C land was deemed habitat for any threatened species, BLM routinely declared ASQs of around 1.1 billion board feet. *See id.* at JA-14, IND_0527316-17.

Plaintiffs argue that BLM's ASQ determination in the 2016 RMPs is contrary to the O&C Act. According to plaintiffs, the O&C Act requires that the ASQ calculation be based on all O&C land, so declaring one based only on the harvest land base violates Congress's mandate. BLM responds that the O&C Act grants it discretion to determine how best to harvest O&C timber in conformity with the principle of sustained yield and the 2016 ASQ calculation is entirely consistent with that principle. BLM further contends that, because O&C land is habitat for certain protected species, it must "harmonize [its] obligations under the O&C Act with the ESA (and other later-enacted environmental legislation)," and the land allocation system used in the 2016 RMPs is necessary to avoid violating Congressional directives in that legislation. Fed. Defs.' Cross-Mot. Summ. J. (Case No. 16-1599) at 20.

## III. Proclamation 9564

Plaintiffs also challenge President Obama's January 12, 2017 proclamation adding approximately 40,000 acres of O&C land to the Cascade-Siskiyou National Monument. *See* Proclamation 9564, 82 Fed. Reg. 6145 (Jan. 18, 2017). Within the boundaries of the monument, "[t]he commercial harvest of timber . . . is prohibited, except when part of an authorized science-based ecological restoration project." *See* Proclamation 7318, 65 Fed. Reg. 37,249, 37,250 (June 13, 2000).

Again, plaintiffs argue that limiting timber harvest in this way violates the O&C Act. As they read it, the Act precludes O&C timberland from being set aside for *any* purpose other than commercial timber production, so Proclamation 9564 irreconcilably conflicts with a Congressional mandate. BLM, not surprisingly, disagrees and argues that the O&C Act does not require that O&C land be harvested to the maximum extent possible. According to BLM, therefore, there is no conflict between President Obama's expansion of the national monument and Congress's directives that O&C timberland be managed for forest production and O&C forests be harvested in conformity with the principle of sustained yield. Intervenors, predictably, support the Government on these points.

The disputed issues in all these cases thus turn on the extent to which the BLM, the President, or both can impose these limitations on O&C timber harvest without violating the O&C Act.

## ANALYSIS

The question whether the 2016 RMPs violate the O&C Act begins, but does not end,

with a determination of whether the O&C Act imparts discretion on BLM with respect to timber harvest decisions. BLM argues that it has been delegated such discretion, so it can impose limitations on O&C timber harvest without violating any mandate in the O&C Act. And to be sure, several courts—including this very Court in a previous case—have recognized that BLM has discretion when declaring an ASQ. *See Portland Audubon Soc. v. Babbitt*, 998 F.2d 705, 709 (9th Cir. 1993) ("We find that the plain language of the [O&C] Act supports the district court's conclusion that the Act has not deprived the BLM of all discretion with regard to either the volume requirements of the Act or the management of the lands entrusted to its care."); *Swanson Grp. Mfg. LLC v. Salazar*, 951 F. Supp. 2d 75, 82 (D.D.C. 2013) (Leon, J.) ("BLM has discretion as to establishing the ASQ, selecting the timberlands, pricing the sale (at 'reasonable prices on a normal market'), scheduling the sale, and even rejecting bids."), *vacated on other grounds sub nom. Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235 (D.C. Cir. 2015); *Seattle Audubon Soc. v. Lyons*, 871 F. Supp. 1291, 1314 (W.D. Wash. 1994) ("The management decision made here in regard to the O & C[] lands was a lawful exercise of the Secretary's discretion."), *aff'd sub nom. Seattle Audubon Soc. v. Moseley*, 80 F.3d 1401 (9th Cir. 1996).

But this, of course, means only that BLM's ASQ declaration in the 2016 RMPs does not *necessarily* violate the O&C Act. After all, BLM's discretion has limits. It must, for example, manage O&C land "for permanent forest production" and harvest timber "in conformity with the princip[le] of sustained yield." 43 U.S.C. § 2601. It must declare an ASQ within those parameters. *See id.* ("The annual productive capacity for such lands

shall be determined and declared as promptly as possible after August 28, 1937 . . . ."). And it "must sell [the declared ASQ] or so much thereof as can be sold at reasonable prices on a normal market" each year. *Swanson Grp.*, 951 F. Supp. 2d at 81-82 (emphasis omitted). Even when acting within the bounds of these constraints, moreover, BLM may not take actions that are "arbitrary, capricious," or "an abuse of discretion." 5 U.S.C. § 706(2)(A).

Because of these constraints on BLM's discretion, some limitations on O&C timber harvest do violate the O&C Act. BLM itself concedes that reducing O&C timber harvest to a *de minimis* total or for reasons unrelated to an applicable statutory directive would likely be unlawful. *See* Fed. Defs.' Cross-Mot. Summ. J. (Case No. 16-1599) at 21 ("Plaintiffs assert that any interpretation of the O&C Act that vests BLM with discretion to determine how best to manage the lands could result in BLM reducing sustained yield timber production to only a single board foot per year. This argument ignores the constraints that the O&C Act imposes on management of the O&C lands. . . . A reduction of the sustained-yield harvest of timber in a manner that fails to meet the purposes of the O&C Act and is not required to comply with another statute could potentially be considered arbitrary or capricious." (citations omitted)). And this means that, when BLM decides to reduce the ASQ or divide O&C land into areas that can be harvested and areas that cannot be harvested, details matter. While some such plans have been deemed "a lawful exercise of . . . discretion," *Lyons*, 871 F. Supp. at 1314, a plan that is similar in form but that reflects an arbitrary or capricious decision, or exceeds the statutory bounds of BLM's discretion,

will not pass muster.

Here, the details of O&C land management have apparently changed since BLM issued its 2016 RMPs. In those RMPs, BLM allocated 498,597 acres to the harvest land base and declared an ASQ of 205 million board feet. *See* AR at JA-1, IND_0512707-10; JA-1, IND_0512745; JA-2, IND_0513027-29; JA-2, IND_0513065. As of 2017, however, President Obama's Proclamation 9564 prevents BLM from "rely[ing] []on . . . approximately 16,448 [of those] acres [in that harvest land base] as a source for contributing to its ASQ of timber," according to the agency. Fed. Defs.' Cross-Mot. Summ. J. (Case No. 17-280) at 10 [Dkt. # 46]. The already limited area of O&C land that BLM allocated to timber harvest has thus been shrunk further.

BLM's response to these changes could very well affect the disposition of these cases. If, for example, BLM amended its land allocation to replace the 16,448 acres that Proclamation 9564 removed from the harvest land base, the rationale for the 2016 RMPs provided in the current administrative record *may* be the appropriate record on which to judge BLM's compliance with its statutory obligations. If, on the other hand, Proclamation 9564 has resulted in a permanent decrease of the harvest land base and the operative ASQ, BLM's reasons for adopting the 2016 RMPs may no longer be applicable. Changes to the 2016 RMPs following the issuance of Proclamation 9564, if there were any, could also raise mootness issues. *See San Juan Citizens Alliance v. United States Bureau of Land Mgmt.*, 326 F. Supp. 3d 1227, 1256 (D.N.M. 2018) ("[T]he Court deems it unnecessary and unwise to address . . . arguments, which may become moot based on BLM's revised

analysis or based on changes in circumstances . . . ."). Unfortunately, BLM's response, if any, to Proclamation 9564 cannot be determined from the administrative record excerpts filed in Case Numbers 16-1599 and 16-1602. Those record excerpts do not contain documents that postdate President Obama's proclamation. *See* AR, Index of Documents for Joint Appendix.

BLM's response to Proclamation 9564 will also inform plaintiffs' challenge to the proclamation itself. Plaintiffs argue that Proclamation 9564 exceeded the President's authority because it conflicts with the O&C Act—that "Congress's express mandate in the O&C Act necessarily controls over the [President's] discretionary authority" to declare national monuments. Pl.'s Mot. Summ. J. (Case No. 17-280) at 19 [Dkt. # 41]. As discussed, the O&C Act permits some discretion in managing O&C lands, but that discretion is limited by the Act's mandates. So the question whether Proclamation 9564 conflicts with the O&C Act's mandates implicates the question whether it is possible for BLM to manage the O&C land added to the Cascade-Siskiyou National Monument as monument land without transgressing the limits Congress imposed on BLM's discretion. *See Howard v. Pritzker*, 775 F.3d 430, 437 (D.C. Cir. 2015) ("Statutes are to be considered irreconcilably conflicting where . . . they cannot mutually coexist." (quotation marks omitted)). BLM's ability, or lack thereof, to reconcile the land use restrictions effectively imposed by Proclamation 9564 with the timber harvest obligations imposed by the O&C Act will evidence—one way or the other—whether that reconciliation is possible. But again, BLM's response to Proclamation 9564 is not reflected in the summary judgment

13

records filed in Case Numbers 17-280 and 17-441.

In the final analysis, the Court believes it is essential to know and understand BLM's response to these events, if any. And, if none, its rationale for inaction. Accordingly, a remand to BLM for the purpose of developing a more complete record would seem to be the most prudent course in these cases. "[C]ourts cannot exercise their duty of review unless they are advised of the considerations underlying the action under review, [so] reviewing courts will often and quite properly pause before exercising full judicial review and remand to the agency for a more complete explanation of a troubling aspect of the agency's decision." *Checkosky v. SEC*, 23 F.3d 452, 463 (D.C. Cir. 1994) (quotation marks and citations omitted). Here, I am not only being asked to determine whether two actions conflict with a land management statute, but also whether the actions themselves impose conflicting management directives on the 16,448 acres of land that President Obama effectively removed from the statute's jurisdiction. As such, further judicial review will undoubtedly benefit from a complete explanation of how BLM has reconciled the 2016 RMPs with Proclamation 9564.

## CONCLUSION

For the foregoing reasons, the federal defendants in these cases shall file, on or before June 3, 2019, BLM's explanation of how O&C land—both within and outside the Cascade-Siskiyou National Monument's boundaries—is currently being managed, including any explanation for the changes, or the lack of changes, to the land's management plan following the issuance of Proclamation 9564, and including any supporting materials.

The parties will have the opportunity to amend their cases for summary judgment based on this amended record. Accordingly, I will DENY the pending summary judgment motions and cross-summary judgment motions without prejudice. Within fourteen days of the federal defendants' filing of the supplemental records, the parties shall confer and file a joint proposed briefing schedule for their renewed motions.

/s/ Richard J. Leon
RICHARD J. LEON
United States District Judge